IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WANN VAN ROBINSON, MARY D.      )
ROBINSON, and THE WANN VAN      )
ROBINSON REVOCABLE TRUST,       )
                                )
            Plaintiff-Appellees, )
                                )
            v.                  )       1:14cv1083
                                )
JASON CLINT WORLEY,             )
                                )
            Defendant-Appellant. )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

This matter is before the court on appeal from an order of the Bankruptcy Court in an adversary proceeding. (Doc. 6-10.)[1] The Bankruptcy Court, in a 16-page memorandum opinion and order, concluded that the debtor, Jason Clint Worley, intentionally undervalued an asset in his schedule of personal property in order to defraud creditors, and it therefore denied him discharge pursuant to 11 U.S.C. § 727(a)(4). (Id. at 15.) On December 15, 2015, the Bankruptcy Court denied Worley's motion to reconsider the ruling. (Doc. 6-14.) Worley appealed, and this court heard argument on September 21, 2015. For the reasons that follow, the Bankruptcy Court's decision to deny discharge is affirmed.

**I.    BACKGROUND**

Worley graduated from the University of Florida in 2001 with

---

[1] This and all subsequent record citations are to case no. 1:14cv1083.

a bachelor's degree in finance. (Doc. 6-10 at 2.) After college, he worked for the Edward Jones investment firm and obtained a Masters in Business Administration from Emory University. (Id.) He also earned his Series 7 and 63 licenses to perform securities transactions. (Id.) In 2006, Edward Jones promoted Worley to limited partner. (Id.) Around 2009, Worley left Edward Jones to pursue a series of opportunities, none of which ultimately resulted in lucrative employment. (See id. at 4.)

During his time at Edward Jones, Worley became "enticed" by the "heavy investment environment" of the early 2000s. (Id. at 3.) As a result, he invested in several real estate ventures obviously designed to make a profit on resale, including a house in Florida ($15,000 payment and $305,000 loan), a property at Cinnamon Lake ($10,000 payment and $70,000 loan), a home in Highlands, N.C. ($10,000 payment and a $325,000 loan), a property on Dog Island (Worley's share of expense was $60,000), and a 1/3 investment share in a property at Alligator Island ($60,000 payment and a 1/3 share of $720,000 loan). (Id.)

Pertinent here, in 2006 Worley and his childhood friend, Joshua Crapps, created Gemini Land Trust, LLC ("Gemini"). (Id.) Worley contributed $65,000 to Gemini in exchange for a 49% share of the company. (Id. at 4.) Worley and Joshua Crapps created Gemini for the sole purpose of holding a 10% stake in Pelham Land Group, LLC ("Pelham"), a venture organized by Crapps' father,

2

Daniel Crapps, a real estate investor. (Id. at 4–5.) Pelham used Gemini's funds, along with those of other investors, to purchase 587 acres of timberland in Mitchell County, Georgia, with an estimated value of $3,000 per acre. (Id. at 5.) The purpose of Pelham and Gemini was to resell Pelham's undeveloped land for a profit (Doc. 7 at 95), although the property generated a small stream of revenue from farming (approximately $8,000/year), hunting (approximately $5,000/year), and timber (varying significantly and "difficult to estimate"). (See Doc. 5 at 20, 60; Doc. 6 at 33–34; Doc. 7 at 95; Doc. 6-10 at 5.) From 2008 to 2012, Worley's annual K-1 tax documents for Gemini listed his capital account between $67,555 and $68,985. (Doc. 6-10 at 5.) As of 2012, the total value of Gemini was estimated to be $126,705. (Id. at 6.)

Worley filed for bankruptcy in early 2013. (Id.) He categorized his case as a "no asset" case, (id. at 6), meaning that any assets not sold by the trustee would be abandoned to the debtor, Worley, pursuant to 11 U.S.C. § 554 (id. at 6 n.3). On his schedule of assets, he represented the value of his interest in Gemini to be $2,500. (Doc. 4-8 at 10.) He described his interest as a "48% interest in Gemini Land Trust, LLC[.] Gemini itself is a minority interest holder in a larger LLC which owns

3

500 acres of timber land in Georgia." (Id.)[2] Worley arrived at his $2,500 valuation by using what he terms a "capitalization rate" method. (Doc. 6-10 at 9.) Specifically, he took the largest annual distribution he received from Gemini, $483, rounded it up to $500, and multiplied by five. (Id. at 9-10.) Worley was familiar with this method from his MBA training, and he knew that capitalization rates are sometimes used to value businesses. (Doc. 7 at 127, 156-57.) Worley did not consult with Daniel or Joshua Crapps to seek their evaluation of his interest in Gemini. (Doc. 6-10 at 10.)

Although Worley initially categorized his bankruptcy filing as a no asset case, the bankruptcy trustee, upon seeing that Gemini owned a 10% stake in Pelham, notified Worley's creditors that assets would likely be available for distribution. (Id. at 6 n.2.; Doc. 7 at 198-99.) In 2014, Pelham sold the majority of its real estate holdings, resulting in a distribution of $100,000 to Gemini. (Doc. 6-10 at 10.)

Appellees filed an adversary complaint objecting to discharge with the United States Bankruptcy Court for the Middle District of North Carolina. (Doc. 4-3.) At trial, Worley testified that he relied on the advice of his bankruptcy counsel in selecting a

---

[2] Worley revised this statement to reflect a 49% interest (Doc. 4-10 at 2), yet his K-1's for Gemini listed his ownership share as 50% and Worley testified that was erroneous. (Doc. 6-10 at 5-7.)

4

valuation method for Gemini. (<u>See</u> Doc. 7 at 49–50.) Worley's bankruptcy counsel did not testify. The Bankruptcy Court denied discharge, and Worley brought the present appeal. (Doc. 1.)

## II. ANALYSIS

This court exercises jurisdiction pursuant to 28 U.S.C. § 158(a) and Fed. R. Bankr. P. 8003. On appeal from a bankruptcy proceeding, this court reviews the Bankruptcy Court's legal conclusions <u>de novo</u> and its factual findings for clear error. <u>Jenkins v. Simpson (In re Jenkins)</u>, 784 F.3d 230, 234 (4th Cir. 2015). Under the clear error standard, a reviewing court must affirm the lower court's findings of fact so long as they are plausible in light of the record viewed in its entirety, even if the reviewing court might have reached a different conclusion. <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573–74 (1985). "Deference to the bankruptcy court's factual findings is particularly appropriate when, as here, the bankruptcy court presided over a bench trial in which witnesses testified and the court made credibility determinations." <u>Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.) Inc.)</u>, 453 F.3d 225, 235 (4th Cir. 2006).

The bankruptcy process is designed to give honest debtors a fresh start. <u>Farouki v. Emirates Bank Intern., Ltd.</u>, 14 F.3d 244, 249 (4th Cir. 1994) (citing <u>Lines v. Frederick</u>, 400 U.S. 18, 19 (1970)). A debtor's discharge should be denied, however, if the

debtor "knowingly and fraudulently" makes a "false oath or account." 11 U.S.C. § 727(a)(4)(A). "In order to be denied a discharge under this section, the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 251 (4th Cir. 1987).

"Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact." Id. Accordingly, the court will review the Bankruptcy Court's findings for clear error. Id.[3]

## A. False Statement

The first requirement for a denial of discharge under § 727(a)(4)(A) is that the debtor make a false oath. See id. Statements in a debtor's sworn bankruptcy schedules qualify as oaths for the purposes of this section. See id.; Saslow v. Michael (In re Michael), 452 B.R. 908, 919 (Bankr. M.D.N.C. 2011). An oath is false when it includes a material misrepresentation. See id. In order to qualify as material, a false statement need not result in harm to creditors. See Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984). Rather, a statement

---

[3] Worley acknowledges that the Bankruptcy Court's conclusions regarding his intent and the falsity of his statements present questions of fact. (Doc. 10 at 9.) He frames the primary issue on appeal, however, as "whether the Bankruptcy Court correctly applied the law in concluding that the evidence before it supported a finding of fraudulent and knowing intent." (Id. at 9–10.) To the extent Worley's arguments present questions of law, the court reviews them de novo. Jenkins, 784 F.3d at 234.

is material so long as it concerns the existence or disposition of a debtor's property. Williamson, 828 F.2d at 252 (citing Chalik, 748 F.2d at 618). As a result, "[t]here is little that will prove to be immaterial for the purposes of required disclosure if it aids in understanding the debtor's financial affairs and transactions." Garcia v. Coombs (In re Coombs), 193 B.R. 557, 566 (Bankr. S.D. Cal. 1996).

Here, the Bankruptcy Court found that Worley falsely listed $2,500 as the value of his interest in Gemini on his bankruptcy schedules, and it concluded that this misstatement of Gemini's value was material. (See Doc. 6-10 at 14–15.) The Bankruptcy Court cited Worley's initial $65,000 capital contribution to Gemini and Worley's K-1 tax documents that listed his capital account between $67,555 and $68,985. (Id.) Noting that it recognized that the value of Worley's interest in an LLC was not necessarily equivalent to the price of the entity's underlying investment property, (id. at 14), the Bankruptcy Court found that Worley's estimate nevertheless was "so low as to be unrealistic." (Id.)

The Bankruptcy Court found that Worley's minority interest in Gemini was worth at least five times the value he reported. (See id. at 10.) Specifically, Daniel Crapps testified (by deposition)[4]

_____

[4] Although Daniel Crapps has testified as an expert witness in the past,

that minority stakes in companies like Gemini typically sell for 20-35% of the value they would produce if the entity were sold as a whole. (See Doc. 5 at 59-60 (stating ranges of 20-30% and 20-35%).) Assuming a discount rate of 20%, the court noted Worley's interest in Gemini worth "at least $13,212.80." (Id. at 10.)

After carefully reviewing the record in its entirety, the court concludes that the Bankruptcy Court did not clearly err. Worley's claim that his interest in Gemini was worth only $2,500 in 2013 relies wholly on his capitalization rate method. That method estimated Worley's net share of Gemini's cash flow from the Pelham property and then capitalized it at a rate of return – here, Worley chose a rate of five times. (Doc. 7 at 156-57.) Capitalization rate methods depend in large part on the income an asset produces. See In re Windsor Hotel, L.L.C., 295 B.R. 307, 310-11 (Bankr. C.D. Ill. 2003). As a result, courts typically use capitalization rates to evaluate income-producing properties like hotels and office buildings. See, e.g., id. at 316 (hotel); In re Southmark Storage Assocs. Ltd., 130 B.R. 9, 14 (Bankr. D. Conn.

---

(see Doc. at 8-9), the parties did not appear to tender him as an expert witness in this case. There is some authority supporting the proposition that lay witnesses may offer opinions even on matters appropriate for expert testimony in some circumstances. See Soden v. Freightliner Corp., 714 F.2d 498, 511 (5th Cir. 1983); Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc., 414 F.3d 546, 551-52 (5th Cir. 2005); In re Shavers, 418 B.R. 589, 615 n.26 (Bankr. S.D. Miss. 2009). Regardless, none of the parties objected to the admission of his opinions, and both sides use his testimony to support their positions. (See Doc. 14 at 9-10; Doc. 17 at 7-9.)

1991) (storage facility); In re First Tulsa Partners, 91 B.R. 583, 586 (Bankr. N.D. Okla. 1998) (office buildings). This method is most appropriate when the property has achieved a stabilized level of revenue. See Windsor Hotel, 295 B.R. at 310.

The Bankruptcy Court did not clearly err in finding that Worley's capitalization rate approach was inapplicable here and "inconsistent with the Debtor's knowledge." (Doc. 6-10 at 15.) Both Worley and Joshua Crapps testified that Gemini's primary goal was to buy real estate interests in the hopes of quickly selling those interests at a higher price. (Doc. 7 at 95; Doc. 6 at 33–34.) Daniel Crapps likewise testified that Pelham purchased land with the intention of reselling it for a profit. (See Doc. 5 at 20, 60.) Moreover, the annual revenue from farming and hunting licenses on Pelham's land generated only one percent of the land's purchase price. (See Doc. 6-10 at 5.) In light of all this, it is a fair conclusion that Gemini and Pelham's owners considered the revenue generated by the rural farmland to be incidental to the real purpose of their investment.

Worley has not cited any authority approving of the use of income-based valuation methods to appraise investment property that is held primarily for speculation, rather than for income or cash flow. The Bankruptcy Court's conclusion that Worley's capitalization rate method did not produce an appropriate estimate of Worley's interest in Gemini, a speculative venture whose value

9

has never been based on its potential to produce a steady stream of income, was not erroneous. (See Doc. 8 at 13.)

Worley's valuation of $2,500 would also represent a precipitous decline in Gemini's share of the market value of Pelham's land. This might be credible if there were evidence that natural or market forces destroyed all or most of the value of Pelham's property, but the market value of Pelham's real estate declined only slightly during this period. (See id. at 5 (finding that the sale value of Pelham's land dropped from $3,000 per acre in 2006 (approximately $1.7 million in value) to $2,250 per acre in 2012 (approximately $1.32 million in value)).) On this record, the Bankruptcy Court could reasonably conclude that the value of Worley's investment did not inexplicably depreciate more than 96% in 7 years.

Worley argues that his $2,500 valuation of his interest in Gemini is nevertheless supported by the "discount rate" method suggested by Daniel Crapps.[5] (Doc. 17 at 8.) As noted, Daniel Crapps testified (by deposition) that minority stakes in companies

---

[5] In his reply brief, Worley also urges two other methods prescribed in Gemini's operating agreement to produce comparable estimates. (See Doc. 17 at 9-11.) Worley attaches the Gemini operating agreement to his reply brief, but the document was not part of the record before the Bankruptcy Court and has not been added to the record on appeal. This court declines to consider evidence that was not before the Bankruptcy Court. See First Nat. Bank of North East v. Fockler (In re Crystal Beach Manor, Inc.), 649 F.2d 213, 215-16 (4th Cir. 1981). Even if it did, as explained below, this document would not change the court's overall conclusion about the evidence supporting the Bankruptcy Court's valuation of Gemini.

like Pelham typically sell for 20-35% of the value they would produce if the entity were sold as a whole. (See Doc. 5 at 59-60.) Assuming a discount rate of 20%, Worley concedes that Gemini's interest in Pelham is worth $26,425.60. (Doc. 17 at 9.) The Bankruptcy Court concluded that Worley's interest in Gemini should be worth at least half that amount, or $13,212.80. (Doc. 6-10 at 10.) But Worley argues for a double application of the discount because he holds a minority stake in Gemini, which holds a minority stake in Pelham. (See Doc. 17 at 7-9.) By this logic, Worley's 49% interest in Gemini is worth just 20% of $12,948.54, or $2,589.71.

To be sure, Daniel Crapps did not specifically testify to a double application of his proposed discount. (See Doc. 5 at 59-61.) But even if the testimony were susceptible to multiple interpretations, the court need not determine the correct application in this case. The Bankruptcy Court's application is not clearly erroneous. Moreover, Daniel Crapps testified that he knew nothing about Gemini or its ownership (Doc. 5 at 26, 50), and even if Daniel Crapps had provided the only expert testimony in this case, his opinion would not be conclusive or binding on the factfinder, see Sec.-First Nat'l. Bank of L.A. v. Lutz, 322 F.2d 348, 355 (9th Cir. 1963); Partners, LLC v. Kore Holdings, Inc. (In re Rood), 459 B.R. 581, 610 n.25 (Bankr. D. Md. 2011); In re Villas

11

at Hacienda Del Sol, Inc., 364 B.R. 702, 710 (Bankr. D. Ariz. 2007).

Although the exact value of Gemini was not established with certainty, the record as a whole clearly supports the Bankruptcy Court's finding that Worley's interest in Gemini is worth substantially and materially more than $2,500. The Bankruptcy Court could reasonably credit the combined weight of Worley's capital contributions, expected distributions, and the testimony of Pelham's manager over an estimate derived from a valuation method that is patently inappropriate for the asset in question. The court therefore concludes that the Bankruptcy Court's finding as to the valuation of Worley's interest in Gemini is not clearly erroneous.

**B.    Intent to Defraud**

The second requirement for a denial of discharge under § 727(a)(4)(A) is that the debtor's false statement be made "willfully, with intent to defraud." Williamson, 828 F.2d at 251. A debtor has the requisite intent to deceive when his statements are inconsistent with his knowledge. Michael, 452 B.R. at 919. Although an honest mistake does not amount to fraudulent intent, id., a debtor's reckless indifference to the truth suffices for the purposes of § 727(a)(4)(A), Belk, 509 B.R. at 520.

Ordinarily, the debtor is the only person able to testify directly about his own intent. Williamson, 828 F.2d at 252. As

12

a result, courts generally must infer fraudulent intent from circumstantial evidence or inferences drawn from a course of conduct. Id.; Belk, 509 B.R. at 520. "Because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the bankruptcy court's factual findings is particularly appropriate." Williamson, 828 F.2d at 252.

Here, the Bankruptcy Court found that Worley listed a value for Gemini that was inconsistent with his personal knowledge. (Doc. 6-10 at 14-15.) In so finding, the Bankruptcy Court found that Worley "impermissibly disregarded his initial capital contribution to Gemini" and failed to recognize that his LLC rights were broader than the limited timber, hunting, and farming profits of the Pelham property. (Id. at 15.) In finding intent and willfulness, the Bankruptcy Court cited Worley's extensive background in finance, his experience interpreting financial documents, his failure to seek an appraisal of Gemini (from Daniel and Joshua Crapps or otherwise), his apparent failure to bring his initial capital contribution to the trustee's attention, and the court's own evaluation of Worley's credibility. (See id. at 13-15.)

The record supports the conclusion that Worley is a sophisticated financial professional and was familiar with the capitalization rate method from his MBA training. Similarly, there

13

is evidence that Worley never considered the income Gemini produced to be a significant component of its value. Thus, the Bankruptcy Court could justifiably conclude that Worley knew his capitalization rate method would materially underestimate Gemini's value. Finally, the Bankruptcy Court noted that Worley initially filed his bankruptcy petition as a "no asset" case. These facts all support the Bankruptcy Court's plausible conclusion that Worley intentionally used his knowledge of the capitalization rate method to lowball his interest in Gemini in an effort to persuade the trustee and his creditors to abandon the property. Such abandonment would allow Worley to retain any profits that might arise from a later sale of Pelham's real estate. See JP Morgan Chase Bank, N.A. v. Koss (In re Koss), 403 B.R. 191, 212 (Bankr. D. Mass. 2009).[6]

To urge a contrary conclusion, Worley first argues that the Bankruptcy Court erroneously found fraudulent intent based solely on its disagreement with his valuation method. (Doc. 10 at 16–22.) Worley misreads the Bankruptcy Court's opinion. In addition to implicitly rejecting the capitalization rate method, the

---

[6] This, of course, proved true just before trial of the adversary proceeding when some of the Pelham land sold and Gemini received approximately $100,000. (Doc. 6-10 at 10.) The Bankruptcy Court was careful to note that it did not consider this fact for purposes of finding fraudulent intent, but it did note it for assessing Worley's credibility when he said he would still list Gemini's value as $2,500 on a petition if filed after such a sale. (Doc. 7 at 133–34.)

Bankruptcy Court explicitly based its finding on Worley's "extensive background in finance and his experience interpreting financial documents." (Doc. 6-10 at 15.) In addition, the Bankruptcy Court relied on its assessment of Worley's credibility during trial, which the court found to be "suspect." (Id. at 14; see also Doc. 8 at 28 ("The client did not appear to me to be forthcoming and candid and honest with the Court. That is the clear impression that I [was] left with.").)[7] The Bankruptcy Court therefore found fraudulent intent from multiple facts and circumstances, including Worley's background, course of conduct, and demeanor during trial.[8]

Worley next argues that the undervaluation of a single asset is insufficient to establish fraudulent intent. (Doc. 10 at 25-26.) At oral argument, Worley suggested that the "paramount" issue under § 727(a)(4) is whether an asset was disclosed on a debtor's bankruptcy schedules, not whether it was properly valued. Worley cites two cases in which courts found the undervaluation of assets on a debtor's schedules to be insufficient to deny discharge. See Wines v. Wines (In re Wines), 114 B.R. 794, 797 (Bankr. S.D. Fla.

---

[7] For example, the Bankruptcy Court noted instances where Worley claimed not to recall facts as to his income that he later admitted. (Doc. 6-10 at 2; see also Doc. 7 at 37.)

[8] As the Bankruptcy Court also noted, Worley admitted that his partner, Joshua Crapps, was in a better position to value Gemini, yet he chose not to contact Crapps in favor of using a capitalization rate method that produced a low value for Gemini. (Doc. 6-10 at 10.)

15

1990), aff'd in part, 997 F.2d 852 (11th Cir. 1993); Cristol v. Blum (In re Blum), 41 B.R. 816, 819 (Bankr. S.D. Fla. 1984).

This presents a question of law, which the court reviews *de novo*. It may be true that failure to list an asset at all is a greater sin, but the court concludes that the undervaluation of assets on a debtor's bankruptcy schedules may be sufficient to warrant denial of discharge under § 727(a)(4)(A). Although most cases under this section involve concealed assets, at least two courts have held that undervaluation alone can be sufficient to deny discharge. See, e.g., Office of the U.S. Trustee v. Zimmerman (In re Zimmerman), 320 B.R. 800, 807–11 (Bankr. M.D. Penn. 2005) (denying discharge on the basis of undervalued real property and musical instruments); Weiner v. Perry, Settles, & Lawson Co. (In re Weiner), 208 B.R. 69, 71–72 (9th Cir. B.A.P. 1997) (denying discharge on the basis of undervalued jewelry), rev'd on other grounds, 161 F.3d 1216 (9th Cir. 1997); see also Koss, 403 B.R. at 213–15 (denying discharge on the basis of undervalued household furnishings in addition to other concealed assets). These courts reason that undervalued assets can evidence fraudulent intent because debtors may undervalue their property in the hope that the trustee will not seize the property to pay the debtor's creditors. See Weiner, 208 B.R. at 72.

This conclusion is consistent with the structure of § 727 itself, which contains separate provisions permitting denial of

discharge for false oaths and the concealment of assets. <u>See</u>
§ 727(a)(2), (a)(4). Worley's proposed interpretation would
render § 727(a)(4)(A) superfluous, violating a central canon of
statutory interpretation. <u>See</u> <u>Bilski v. Kappos</u>, 561 U.S. 593,
607–08 (2010). This conclusion is also consistent with the plain
language of the statute's wording, which does not explicitly
restrict the term "false oath" to statements concealing the
existence of assets. <u>See</u> § 727(a)(4).

The cases cited by Worley do not compel a different
conclusion. The court in <u>Blum</u> simply assumed — without explanation
or citation — that undervalued assets are not grounds for denial
of discharge under § 727(a)(4)(A). <u>See</u> 41 B.R. at 819. And
although the court in <u>Wines</u> cited <u>Blum</u> for this proposition, the
facts of that case are distinguishable. In <u>Wines</u>, the court held
that discharge was appropriate even though the debtor drastically
undervalued a legal claim on his bankruptcy schedules. 114 B.R.
at 797. But the debtor in <u>Wines</u> suffered from short term memory
loss, and he subsequently amended his bankruptcy schedules to
reflect the correct value. 997 F.2d at 857 n.9. The court
therefore concluded that the debtor made a bona fide effort to
value his assets. <u>Id.</u> at 857. Worley, by contrast, suffered from
no similar disabilities and never amended his schedules to reflect
a more realistic appraisal of Gemini.

Similarly, a single false statement may justify a denial of discharge. See, e.g., Smith v. Grondin (In re Grondin), 232 B.R. 274, 277 (1st Cir. B.A.P. 1999); see also § 727(a)(4)(A) (permitting denial of discharge based on "a false oath or account"); Koss, 403 B.R. at 213 ("[A]ll that is needed for the denial of discharge under § 727(a)(4)(A) is a single false account or oath.") (citations omitted)). Thus, the Bankruptcy Court did not err in denying discharge based on Worley's undervaluation of a single asset on his bankruptcy schedules.

Finally, Worley contends that the Bankruptcy Court gave insufficient weight to his claimed reliance on the advice of bankruptcy counsel. (Doc. 10 at 22–25.) A debtor's good faith reliance on counsel may, if proved, defeat an inference of fraudulent intent. See U.S. Trustee v. Arnold (In re Arnold), 369 B.R. 266, 271 (Bankr. W.D. Va. 2007). But a bankruptcy court is not bound to accept a debtor's bare assertion that he relied on the advice of counsel. See Boroff v. Tully (In re Tully), 818 F.2d 106, 111 (1st Cir. 1987) ("The short answer to these plaints is that the bankruptcy judge . . . considered them and found them wanting."); Koss, 403 B.R. at 214 ("Nor can the Debtor hide behind the attorney who represented him . . . ."). Instead, in order to raise this defense, a debtor must show that he made a full and fair disclosure of all relevant facts to his attorney. Kaler v. McLaren (In re McLaren), 236 B.R. 882, 897 (D.N.D. 1999). In

addition, reliance on counsel is no defense when it should have been obvious to the debtor that his attorney's advice was erroneous. See Tully, 818 F.2d at 111 ("A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.") This is particularly true when the debtor is a well-educated or sophisticated businessperson. See Koss, 403 B.R. at 213.

Here, the Bankruptcy Court necessarily rejected Worley's advice of counsel argument, thus determining either that Worley did not actually rely on the advice of counsel or that any such reliance was unreasonable given Worley's knowledge of Gemini and the capitalization rate method.[9] In reaching this conclusion, the Bankruptcy Court could reasonably have relied on Worley's extensive background in finance, his extensive investment history, his experience interpreting financial documents, and his demeanor and responsiveness on the stand. (See Doc. 6-10 at 14-15; Doc. 8 at 19-20.) In light of the record as a whole, the Bankruptcy Court did not clearly err in rejecting Worley's advice of counsel argument.

---

[9] Although the Bankruptcy Court's opinion does not explicitly address Worley's reliance on counsel claim, it implicitly rejected this conclusion when it found that Worley's statements were "inconsistent with [his] knowledge." (See Doc. 6-10 at 15.) The Bankruptcy Court also rejected the assertion that Worley relied on counsel during the hearing on Worley's motion to reconsider. (See Doc. 8 at 19-20.)

To support a contrary assertion, Worley compares his situation to that of the debtors in Arnold and Harker v. West (In re West), 328 B.R. 736 (Bankr. S.D. Oh. 2004). But Worley's situation differs in three important respects. First, the debtors in Arnold and West did not share Worley's training or experience evaluating the type of assets they undervalued on their bankruptcy schedules. See Arnold, 369 B.R. at 268–69; West, 328 B.R. at 741. Second, the debtors in Arnold and West relied on counsel's legal advice as to the meaning of the questions in their bankruptcy schedules, rather than the factual issue of value. See Arnold, 369 B.R. at 271–72 (finding no fraudulent intent when counsel advised the debtor that bankruptcy schedules should reflect the value of beneficial use of trust property, rather than the value of the property itself); West, 328 B.R. at 740–41 (finding no fraudulent intent when counsel advised the debtor that bankruptcy schedules should reflect the "pawnshop" value of jewelry instead of its retail value). Finally, and most importantly, the courts in Arnold and West found the debtors' purported reliance on counsel to be credible. See Arnold, 369 B.R. at 272–73; West, 328 B.R. at 750–51. Here, by contrast, the only evidence of Worley's reliance on counsel is Worley's own testimony, which the Bankruptcy Court did not find to be credible.

Although Worley testified that he gave counsel all of the necessary documentation, there is no evidence that he

20

affirmatively brought his capital contribution or the nature of his plans for Gemini to his attorney's attention. A debtor cannot "hold [counsel] to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack." Tully, 818 F.2d at 111. Moreover, even if Worley had shown that he made a full and fair disclosure to counsel, the Bankruptcy Court could reasonably have concluded that the erroneous nature of counsel's advice was obvious to Worley because of his financial background, training, and knowledge of Gemini. This conclusion is particularly strong in light of the considerable deference this court gives to the factfinder's credibility determinations. See Williamson, 828 F.2d at 252.

Thus, even if Worley presented sufficient evidence to raise a plausible claim of reliance upon counsel, the Bankruptcy Court's opposite finding is plausible as well. The court therefore concludes that the Bankruptcy Court's finding of fraudulent intent was not clearly erroneous.

**III. CONCLUSION**

Denial of discharge is a drastic remedy, not to be taken lightly by the court. First Leasing Co. v. McGalliard (In re McGalliard), 183 B.R. 726, 732 (Bankr. M.D.N.C. 1996). Nevertheless, it is necessary in appropriate cases to preserve the integrity and smooth functioning of the bankruptcy system. See Tully, 818 F.2d at 110. Bankruptcy protects only the "honest but

21

unfortunate debtor," <u>Grogan v. Garner</u>, 498 U.S. 279, 286–87 (1991), and those who "play fast and loose with . . . the reality of their affairs" should be denied the system's protections, <u>Tully</u>, 818 F.2d at 110.

The Bankruptcy Court recognized the harshness of the result in this case, but it was clearly influenced by Worley's demeanor on the stand at trial. As the Bankruptcy Court explained, "[T]here are very few debtors that I have denied a discharge because it is so harsh . . . if I struggle with the issue at all, the benefit of the doubt always go to the debtor. I did not struggle in this case." (Doc. 8 at 28.) After reviewing the record in its entirety, this court cannot say that the Bankruptcy Court clearly erred or made an error of law.

For the foregoing reasons, therefore, the order of the Bankruptcy Court denying discharge to the debtor (Doc. 6-10) is AFFIRMED.

  /s/   Thomas D. Schroeder<br>
United States District Judge

September 30, 2015